The next case for argument is 15-1983 Organik Kimya AS v. Rohm Haas Company If the TOTA process were a competitor's process, instead of in the prior art, Rohm and Haas would probably accuse it of infringement and would almost certainly win, because the TOTA process uses the same ingredients as the patents in suit, it uses under the same conditions, it uses the same suitable swelling agents, it explains that these bases... But how did the board get around that then? I mean, they're supposed to give some deference to the board, at least on some issues. In one of their opinions, they talked about inherency, in the other, not so much. So how would you characterize the board's position on that? Well, I would say the board erred, first and foremost, in construing the term swelling agent. And I think that error drove its inherency analysis, which was also erroneous. Can I ask, though, just speaking for myself, which is all I do, is that I'd prefer you accept their claim to the board's claim construction as being the correct one, and give us more of an argument about why, how you see the prior art, given the claim construction the board agreed to. Sure. If we accept the claim construction as being correct, which of course we don't. The board additionally erred in requiring proof by inherency. The claims here are fairly simple. They are method claims that require the addition of three ingredients, a multistage polymer, a monomer, and a swelling agent under a certain condition, no substantial polymerization, and then reducing the monomer level by 50%. The claims don't require a swelling step. They don't require the production of swollen or hollow particles. The methods are directed... Tell me why I frankly did not read the board as requiring a showing of inherency. What I read the board as saying is, you're the genealogist. Let's take the claim construction as a given for a moment, which is to say that this thing you put in has to be capable of permeating the shell and swelling the core in the process you use it for. I think I've accurately summarized that. You, the challenger, have not shown that in the TODA process, or the TUDA process, that the potassium hydroxide or the sodium hydroxide is capable of doing those things. Neither TODA nor TUDA says it's doing those things. It doesn't necessarily. And you did not do any experiments to show that it's capable of doing so. You simply criticized their experiments. Assuming that they said the last thing, they did not depend on inherency showing. Well, Your Honor, I would respectfully disagree. The board said it was reading our argument as an inherency argument. It acknowledged, it says, we see you're arguing... Because you didn't put on any evidence to show that in TODA and TUDA, the potassium hydroxide or sodium hydroxide was capable of swelling in that process. I would respectfully disagree a bit. The board went to inherency not because there was no showing of swelling. It was because of its construction, which required a specific type of swelling, that it permeated the shell and swelled the core. We're taking that as a given for purposes of this question. If we take that as a given, the error here is that the TODA references expressly disclosed the use of a swelling agent that the patents in suit describe as being suitable, not for any process, but for the claimed process. In TODA, we're not talking about some set of ingredients that are exotic and different than what Blankenship discloses. It's the same ingredients. Let me focus on that, because at least in my preparation, I've been focused on that. At the bottom of Column 8, again, putting aside the core construction piece, the typographical error, the including, we'll put that aside. The next paragraph says suitable swelling agents include, and potassium hydroxide is listed, and I think there's no dispute that the description is broad enough that everybody agrees it also would cover sodium hydroxide. That is some kind of an admission, but the question is what kind? What does it admit? It seems to me it could have either of two scopes. One is for every one of the hundreds of thousands of permutations of particular embodiments that we have described under the somewhat generic claim conditions, lots of this, lots of monomers, lots of polymers, lots of this, that, it is always a swelling agent. It might mean that. Or it might mean, depending on which one you use, it's a swelling agent. And in the absence of a finding or evidence, I don't know how to interpret the scope of that admission. Your Honor, the claims only require adding an ingredient that is capable of causing swelling. So just like the example or the analogy we gave of a process for making bread dough where you have to add a leavening agent, when you go to the grocery store and you buy the yeast, it's a leavening agent. You don't know whether it's actually going to leaven yet or not because you may use it in a way that doesn't work. Or if I hand you a screwdriver, it's a screwdriver. Even if you can't happen to get a particular screw driven in, it's still a screwdriver because it's recognized as having that function. The basis of that issue in these processes, and again, it's important to realize that we're not talking about a different set of ingredients and different conditions than the blankenship patents. We're talking about the same set of ingredients and the same conditions. Blankenship for the patents in suit. It's the same set of ingredients. In other words, totally— Let me see if I can just—maybe you didn't understand. I didn't sharply identify what my puzzle is. You say, reasonably enough, that the bottom of colonnade, the suitable swelling agents include potassium hydroxide, is some kind of an admission. But I don't know the scope of the admission. If you take the set of claimed and column one described sort of generic conditions and you go through column two, three, four, so on, it identifies—I don't know what the number of permutations, the specific things that could fit into each category, but it's a very, very large number. Is that an admission that in every single one of those permutations, sodium hydroxide is capable of permeating the shell and swelling the core? Absolutely. Or only for some of them, but you need to figure that out? No. It's an admission that it's capable of doing it. How do we know that? The words do not tell us which of those two things, those two meanings it is when you say suitable swelling agents are these for, I'm going to call it a million, a million possible processes I've just described in generic terms. We know it because not only does the patent say it, but when you look at the examples— What you just said does not respond to my point that the language does not make that clear. It's a perfectly permissible use of the English language to say this is suitable in the processes we've just described to being either in every single one of them or in some of them depending on which ones we pick. Your Honor, I think it's capable of causing swelling. It may depend on process conditions, but the claims don't require any particular process conditions other than the one, which is no substantial polymerization. It's just like if you buy a package of yeast. Did you put on an expert who said that in the context of this technology, this technology, that it makes perfect sense to say these bases would always be capable of permeating the core and swelling or permeating the shell and swelling the core in every one of the million possible individual combinations that the patent has just described. Our expert looked at the process that was in the prior art and said in that process the bases that are being used are being used to swell. And that's also what Toda says. In other words, it's not just me saying that. Toda also says, and we put multiple of these quotations in our gray brief at pages 20 to 21, multiple times Toda says the reason we're doing the base treatment step is so the base permeates the shell and swells the core. Their evidence and what they put on, first of all, it's shifted a bit. What they put on was evidence that it doesn't work at all. They called into question the, quote, authenticity of the patents of the prior art itself. In other words, calling into question whether the evidence that was submitted to the patent office by Toda was authentic. Now they're saying, well, maybe it was the acid treatment step and not the base treatment step that actually swelled the cores. Because the cores did swell in Toda. They have photographs of swollen particles. So something swelled those cores. What the patent requires is that you use an agent that is capable of swelling. And both the Blankenship patents at issue here and the Toda patents both say that these bases are capable of penetrating the core and swelling. Their quibble is whether in these particular examples that we use, did they get the shell temperature up high enough for the base to actually penetrate. They did in the Blankenship patents, they did their swelling step at 85 degrees. In the Toda prior art, they did the base treatment step at 80 degrees. So it's a five degree difference. It's the same basic shell polymer. And so there may be a quibble about whether they should have gotten that temperature up a few degrees more, but there's no quibble or there shouldn't be any quibble that these bases are capable of penetrating that shell and swelling the core. Just like, as I say, if you go to the grocery store and you get yeast, it is capable of leavening bread regardless of whether it ever actually does it. A screwdriver is capable of driving a screw. Are you saying it's a quibble as to the difference as to when the swelling agent is added, when the final monomer is polymerized? We were just saying that since the temperature is the same, it doesn't matter. What I'm saying is that the Toda prior art could anticipate and render obvious these claims, even if it were a complete black box between the ingredient step and the last step of reducing the monomer. We don't even need to know what's inside that black box. All we need to know is that they added a swelling agent that is capable of swelling. Blankenship and Toda both say that sodium hydroxide and potassium hydroxide are capable of doing that. Now, it just so happens that in Toda, it's pretty clear that it actually works because they got photographs of swollen particles. But that's beside the point. We don't even need to show that because the claims don't require swelling. They don't require the formation of swollen particles. They only recite three ingredients being put together, one of which is a swelling agent under certain conditions, and then reducing the monomer level by 50%. Nothing in there requires a swelling step. So what is the evidentiary basis, again, for saying that potassium hydroxide is a swelling agent in Toda? The basis is the Blankenship patent says that it's a suitable swelling agent, and Toda says it as well. Let's put aside the Blankenship patent, Column 8, whose scope of the admission contained in that being uncertain, at least to me, if not to you. What in Toda exactly says potassium hydroxide is a swelling agent here? Well, Toda explains. If you go to page 20 to 21 of the Gray Brief, I'm sorry, of our Gray Brief, we collected the statements in Toda. When Toda is explaining its process, its process uses either potassium hydroxide or sodium hydroxide. And when it explains how to set up this process, it explains over and over, make sure you keep the quantity of carboxyl-containing monomer between 20% and 60% because below that, the base won't permeate into the polymer particles. And then it gives specific ranges for the weight ratio of the center layer to the polymer and weight ratios to the center layer to the intermediate layer, all of which are geared towards making sure the base, which is either potassium hydroxide or sodium hydroxide, can penetrate through the layer and neutralize the core. Toda is laying out the exact same theory of swelling that Roman Haas explained in its brief, that you neutralize the core with a base because, remember, it's an acid core. You can't neutralize it with an acid step. You have to neutralize it with a base. Toda is explaining in detail the exact same theory of swelling that Blankenship is explaining. And so that's additional, if you want to say evidence, as to how and why these bases, these fixed bases, not only that, but if you look at all of the examples in the Blankenship patent, I don't recall that they all use potassium and sodium hydroxide, but they certainly use fixed bases such as ammonium hydroxide, very similar properties, and they're used throughout the examples in the patent. So clearly in the context of this type of process with these ingredients, again, we're not talking about different ingredients, we're talking about the same ingredients as Blankenship is disclosing, and the same condition of no substantial polymerization, the prior art is using the same exact bases that Blankenship says are suitable. And that's our evidence as to why these are capable of swelling. The board erred by saying, well, we're going to not only look to see whether these are capable at the time that they're added, but we're going to go look at the unclaimed process step of actually swelling, and then we're going to require you to forensically prove that this thing that everybody agrees essentially is capable of doing it actually did it. It's like if the claim required providing a screwdriver, if I give you a screwdriver, if it's screwdriver, you shouldn't have to prove that it's capable of driving every screw every time in every condition. It's an express disclosure. Before your time runs out, I just want to ask you a logistical question, and your friend can respond if he has a different view. If we were to agree with your argument, not on claim construction, but on TOTA and the disclosure of prior art, this case is still alive, right? Yes, absolutely. And what remains to be done? Are there other arguments? If you agree with our argument on the claim construction, but if you disagree with it. If you disagree with the claim construction, but agree with it. Well, we still have our argument on inherency that this is an express disclosure. In this case, I just want to understand, would the board still have allegations in front of it? I think the only thing, if I understand your question, if you agree that these claims should have been invalidated rather than not held valid, the only thing that would be left would be their contingent claim amendments. If you disagree with how the board did its analysis, for instance, whether the inherency analysis was correct, then it might require a remand to redo the analysis. I guess there might be a question of whether TOTA is enabling or maybe some other. It could be, but again, I know you didn't want to hear about claim construction, but the only enablement argument they made were under a claim construction that we disagree with. So if the court changes the claim construction, I don't think they have an enablement argument under our claim construction. Thank you. Well, we've scored three minutes of rebuttal. Mr. Neumann. Thank you, Your Honor. May it please the court. I would like to address the last point about what would happen if there was a remand, which of course we don't believe would be appropriate here, but there are many issues that would remain. For example, we put in evidence that there was no substantial plumberization. That limitation was not met by TOTA and TUDA. In fact, there was substantial plumberization throughout the process when the base was being used in TOTA and TUDA. So the board never reached the issue as to whether or not TOTA and TUDA met the no substantial plumberization limitation. The board also never reached the issue as to whether or not the TOTA and TUDA references were enabling. And then TUDA, the second one. Isn't there a presumption that the prior art is enabled? There may be a presumption on it, but we submitted evidence that they were not. We put in reproductions showing that if you tried to replicate that process, you did not get, first of all, you didn't get any base into the shell. That's a separate issue. But overall, that the processes were not enabled. So there would be an issue of fact left as to whether or not they're enabling. And then on the issue of, the major issue though would be no substantial plumberization. The board made no finding on that, and our contention, our experts showed. In fact, there is substantial plumberization occurring during the TOTA and TUDA processes, the pertinent portions at issue. On obviousness, the board never reached the issue of, for example, the objective indicia of non-obviousness. We have evidence of copying here. Organic copied the Roman Haas patents. They went so far as to steal related trade secrets, which was the issue of the ITC case. They destroyed evidence in that case. They've been excluded in that. You're making me sorry I asked the question. And then there's also an issue of praise. There are a lot of issues about praise. In their own patent, they said that the Roman Haas patents at issue here are the, quote, most extensive technology jump in the field of core-sheath plumberization of pacifying particles. So that was never considered either. Your Honor, I think just to focus on the issue that was being discussed earlier, one of the issues was whether sodium hydroxide and potassium hydroxide are considered to be swelling agents in all contexts. That was not at least the issue that I was framing in that way. I will stipulate for these purposes that sometimes they're not. The question is, does the sometimes include anything within the range of the universe described within the Blankenship spec? The Blankenship spec, if I can start with the claim construction. I'm not going to argue about it unless you want an argument on that. I'm going to get back to that. The claim construction that the board adopted was one that says that they construed swelling agent as expressing the structural element and in functional terms, capable of permeating the shell and swelling the core in the presence of the multistage polymer and monomer under conditions of the specific process for which the agent is to be used. That was part of the construction. It was also, there was evidence on the plain and ordinary meaning, which is where you start with claim construction, even under BRI. Let me try to focus. This question is clear in my mind, and I'm going to try to make it clear to you. Maybe you understand, which I asked twice of your colleague on the other side. Column 8 says one of the suitable agents, swelling agents, is potassium hydroxide. Now that could mean in every one of the million permutations of polymers and monomers that are enumerated as possibilities under the other conditions being both described at the little bottom of column 1 and then basically claimed that potassium hydroxide is always a swelling agent, or it could mean, under the English language, sometimes it is, sometimes it isn't, but sometimes it is, and that's why we're listing it as suitable. But it depends. How do we know which of those two meanings that admission has? Your Honor, I believe if you start with the plain and ordinary meaning, our expert said, and their expert did not dispute, that swelling agent is always done in the context of a specific process in which it is being used. We asked their head of R&D, we said in the context of a redacted process because of an ITC protective order, would you describe sodium hydroxide as a swelling agent? Was the process that he was talking about one that's otherwise covered by the blankenship? No, it's an emulsion polymerization process. But not within the— No. Okay, so I'm going to modify my question. I don't actually think modify it, I think just clarify it. Okay. That's irrelevant. Is there any way that a chemist, or whoever the relevant person of skill in the art, would understand that the column 8 admission about suitable swelling agents applies to every one of the million previously described combinations of these other conditions, or applies only to some of them? Not that it doesn't apply to something completely outside those, within the class of the million combinations described. Yes. First of all, the person skilled in the art would read the specification, and it says the core polymer of the multistage emulsion polymer swells when the core is subjected to a basic swelling agent that permeates the shell to at least partially neutralize the hydrophilic functionality of the core, preferably it's a pH range, and thereby result in swelling by hydration of the hydrophilic core polymer. In other words, it has to do that. What the spec is saying is that suitable agents could include these bases, but to be a swelling agent consistent with the planetary meaning, in the process in which you're using it, which is what the board got to— I think we're talking at cross purposes. I'm sorry. I'm holding as a given for now that you're correct that to be a swelling agent, this thing has to permeate the shell and swell the core. And I'm also holding as correct the rest of the claim construction, in the process you're using it for. Then column 8 in the next paragraph says suitable swelling agents include potassium hydroxide. Does that mean that potassium hydroxide will meet that swelling agent construction that was just given in the previous paragraph in every one of the million combinations that have been described in columns basically 3 through the top of 8? No, it doesn't say that here. It says suitable agents can include these— How do we know that it doesn't say that? Because a person skilled in the art would know that in order to be a swelling agent, it needs to be able to penetrate the shell and swell the core, and there are simple tests to do that. In other words, our expert came in and said when he read the specification, he understood that for the TODA and TUDA processes, and there's no statement that it's the same process, it's the same conditions. That's their lawyer saying that. Our expert looked at it and said TODA and TUDA have different processes, different conditions. And when I look at that as a person skilled in the art, I can see that the sodium and potassium hydroxide is not capable of penetrating the shell and swelling the core. And then that's step one. And then he did a test, and the test showed, you take micrographic images, that as you added that base that they're talking about, there was no penetration of the shell. Can I ask you—I'm missing something here, and I guess we're having a discussion. If someone were accused of infringing using that, now you say not always and it's only one of the examples, there would be an infringement case, wouldn't there? No. If someone used potassium and sodium hydroxide and it did not penetrate the shell and swell the core, was not capable of doing that, there would be no infringement case whatsoever. But if it did? If it could penetrate the shell and swell the core, and it met the other limitations, yes. But then you would have to do a test to determine that or look at the conditions, which is what our expert did. Our expert took TODA and TUDA, reproduced them, and during the step when the base was added, the shell was too hard, and that's what the evidence showed. This is an issue of fact. The shell was too hard, and the base cannot penetrate the shell and swell the core. So it's an issue of fact. If, in fact, somebody was practicing TODA and TUDA, there would be no infringement case. Those are really unpredictable, and I guess it's just really hard for me to fathom how you're saying that if something was disclosed and covered by the patent, sometimes it may work and maybe one out of 50 times it doesn't work, so therefore there's no infringement in one circumstance and not in the other? The conditions, as the colleague has stated, there are millions of different process conditions. So what you have to do is look to see under the conditions you're using it, which is what the board was getting at, is it capable of penetrating the shell and swelling the core? And it's a simple test to do. Our expert, in fact, if you look at the TODA patent at column 7, it's the 827 patent, A633, TODA actually did a test to see when the hollows start to form, and it states here that they did electron microscopy, and it showed that the polymer particles start to form hollows, this is the bottom of column 7, top of column 8, during the acid treatment. So it's a simple, this is really an issue of science. Can I direct your attention to column 1, which deals with the 435, which deals explicitly with TODA. I mean, there's a shout-out to TODA. Void latex particles is described in the middle of lines 40 to 52. The 827 patent that they're citing here is TODA, right? That's right. And they talk about some of the processes, such as that described by 827, describe the processes whereby in the later stages of polymerizing the shell, the monomer is added to facilitate diffusion of that base into the core of the polymer to achieve swelling. And it goes on and on and on. Right. It goes on and discusses the acid treatment stuff, Your Honor. Yeah. So what that specification is stating is, first of all, that was never relied on by the party below because it says during the latter stages of polymerization. As our expert showed in TODA, there's polymerization going on. So the claim wouldn't be met. If you said this admission here somehow controls, well, then there's no anticipation here at all because it says during the latter stages of polymerization. I just want to double check this because this is what I came in thinking. I was struck by the fact that I could not find any reliance by Organic on that passage before the board as an admission. And the reason, Your Honor, is because if you take— Is that right? That's exactly right. They didn't rely on it because it said during the latter stages of polymerization. So if you accept the characterization of the inventors here, it certainly is not met because it's being polymerized. But it also, Your Honor, it talks about this acid treatment. And the acid treatment in TODA, the specification says what happens, that during the base treatment, nothing happens. They have microscopic images they're discussing. There's no holes. Then they add an acid, and the acid does something to it. But no one alleges the acid treatment is a swelling agent. They've never alleged that that somehow meets a claim at all. And when we asked their expert, Your Honor, this is an issue of fact. Here's what their expert said about TODA and TUDA. Question. Oh, I'm sorry. From A2557-58, it says line 22 carrying over to line 1. It says, okay, but you don't know whether the Nippon references, that's TODA and TUDA, have swelling in the core or not. Answer, it's impossible to say based on the information in the patent. So, in other words, when you read TODA and TUDA, they talk about all these admissions disclosures in TODA. Once again, that list they showed you on page 21 of the brief, they didn't rely on that below either. That's all stuff they added in the reply brief. And the reason is because, unlike their interpretation as counsel, their own expert said that when I read TODA and TUDA, I don't know if there's any swelling of the core. TODA and TUDA are disclosing a process where the base is not able to penetrate the shell and swell the core. That's unrebutted. But our expert did a test and he said, forget this whole idea about does the process work as a whole. He said, I isolated the step when the base is added and it's not able to penetrate the shell and swell the core. And it's a simple chemical test, Your Honor. It's one where you just take electron images and you add the base and you take the photographs. Is anything getting in or not? It's not complicated. Their expert never said, oh, that's not something you can do. It's very easy. We did it. TODA and TUDA did it. They chose not to do it, even though they knew about this reference for over a year before they filed their reply report. So here's the situation where TODA and TUDA on this issue of fat, does it disclose sodium hydroxide and potassium hydroxide that is able to penetrate the shell and swell the core under the conditions of the process where it's being used. And I can tell you there is not a single process. Can I ask you, what in your mind, if any, is the difference between saying it's capable of doing that and it doesn't? Well, Your Honor, capable of doing that means, as the board construed, in the process that is being used. Just hold fixed the process being used. The word is capable of doing it. It doesn't say that swells the core after permeating the shell in the process. It says it's capable of doing that. Can you explain to me what? There must be something broader about the term capable of doing it. Can you explain to me what that something broader is? The word capable means that when you use it in that process, it's able to penetrate the shell and swell the core. I'm sorry. Able doesn't help me to go from capable to able. The requirement was that it's capable of penetrating the shell and swelling the core in the process where it's used, which means if you put it in with the other ingredients there, it will penetrate the shell and swell the core, and it will start some swelling. Regardless of other supplemental process conditions? That's right, Your Honor. As long as there has to be a moment in time where those elements are met by that claim. It says there's a multistage emulsion polymer, there's monomer, and there's a swelling agent, and there has to be conditions of no substantial polymerization. And at that moment you have to... I'm sorry. The time is kind of running out. Do you happen to know whether in our case law there's something illuminating about the term capable and what it tends to mean? Your Honor, I'm not sure what the case law you're referring to. I'm sorry. That's why I'm asking you. I'm not sure what it is either. It's striking. If I say, in some context at least, this is capable of doing this, that doesn't mean it's doing it. It means maybe if I do some other things on top of the specified conditions, it will do it. But capable is broader than it actually occurs, and I'm trying to understand what meaning is to be given to the term capable. Well, I think, Your Honor, in this case, it has to do with capable in the process it's being used in. Because when we asked their expert, he said, if you take sodium hydroxide and put it in a safe and sink it to the bottom of the ocean, is that a swelling agent? And he said, yes, it is. And the point is, in this art, capable is referring to the ability to do it in the context of the process where it's being used, which is why I was going to read the testimony from their head of R&D. He said that sodium hydroxide is a swelling agent only when it's capable of doing it in the specific process where it's being used. And this little back and forth we've been having about the meaning of capable, is that something that they made an issue of? No, their position was that sodium hydroxide and potassium hydroxide are swelling agents whether or not they're capable of achieving any swelling penetrating the shell under the conditions of use. And that was really the dispute here. In other words, they said that sodium hydroxide and potassium hydroxide, if I take TOTA and TUDA, our experts show that the shell that it uses, which is not used by Blankenship, when you put those in, if it's hard as a rock, it doesn't get through. Something happens later with the acid treatment. They would say that if you have a process like TOTA and TUDA and your base is not capable of penetrating the shell and swelling the core, it's still a swelling agent. So to be sure that I understand the chemistry, well, was it clear? We haven't discussed it, so I gather there's no dispute that the critical aspect is that the polymerization is stopped while there's still 50% monomer before the swelling agent is added. Right. There has to be a point in time where there's no substantial polymerization while that swelling agent is present with the other ingredients. That's right. That's right, Your Honor. So their reading, Your Honor, is simply that these bases, if they're capable of doing it in some other process but not in the process where it's being used, well, then that meets swelling agent. And the plain and ordinary meaning and what the spec shows and what the board determined was that, no, it has to be capable of penetrating the shell and swelling the core in the process where it's being used. And on that, Your Honor, it's an issue of fact, and there is no evidence on the other side. Our expert did tests that show that for that particular shell that was being used by TOTA and TUDA, the base was not capable of doing that, and they did no rebuttal tests whatsoever on this. Okay. We have your argument. Thank you. Thank you, Your Honor. Just a few points, Your Honor. Judge Toronto, I think you put your finger on it in the last series of questions you asked. What they're trying to do is read out the word capable, and they're trying to make this claim into a claim that actually requires a swelling step. That's not even the board's construction.  a swelling agent that is capable of swelling. Now, we disagree with the board's additional requirement that it has to actually penetrate the shell and swell the core, but let's accept that for purposes of our argument that the board's construction is correct. Being capable of doing something is not the same thing as doing it. If I hand you a screwdriver, it is capable of driving a screw, but maybe when you try to do it because the screw is rusty, it won't work, but it's still a screwdriver. This term is very much like the term in Greenberg that it's haunt mechanism, which this court said it would be improper to construe as a means-plus-function limitation. I'm going to just play with your screwdriver example. One of the earlier cases today, I think, although we didn't talk about it in the argument, discussed a screw with a safety head, triangular head or something like that. If I gave you a screwdriver that didn't fit in that head, would that be capable of unscrewing that screw? Well, it would be a screwdriver. It may not be a screwdriver that's capable of driving that head. If you interpreted it to mean capable of unscrewing the screw in that process, would that be a screwdriver? I think in the analogy you just gave, the answer is no, it wouldn't be capable. But in this case, these bases are capable. Again, we see the evidence. And the cases you were asking about, the Cadence case that we discussed in our briefs, as well as the Procter & Gamble case, which granted was a district court case, but they got that claim construction exactly right. It was a gelling agent, and the argument that was being made was that a gelling agent isn't a gelling agent until it gels. And the processes that were at issue there didn't actually get to the gelling stage, even though the thing that was added actually was a gelling agent. And the court correctly said in that case that a gelling agent is a gelling agent even if it doesn't gel in a particular circumstance. Here, the claims at issue don't require a swelling step. They don't require any particular temperatures. They don't require any particular anything. They require the addition of an agent that is capable of swelling. Even the Blankenship patents acknowledge that sometimes you have to add something extra to actually achieve the swelling. You say it has to be read that way? I'm sorry, Your Honor? The claim doesn't say capable. It says add a swelling agent. Yeah, well, it's been construed to mean capable. And I don't think there's any argument that it does have a functional element to it. Oh, exactly. That's why I'm trying to understand how what you're saying is dispositive. Well, what I'm saying... Well, first of all, they argued that we are trying to get around this word capable. We acknowledge that it's a functional term. It has to be capable of swelling. What we're saying is that it doesn't have to be capable of swelling in the specific prior art process that it's being used in. It just has to be capable of swelling in the context of swollen polymer particles. And here, the evidence shows it is because both the Blankenship inventors said it's capable and the Toda inventors said it's capable. And so the moment it's added to the other two ingredients under conditions of no substantial polymerization, that limitation is met because it's capable. Thank you. We thank you. That concludes our proceedings for this morning. All rise. Thank you. That will conclude the adjournment until tomorrow morning at 10 a.m.